## NELMS *v.* THE STATE.

The only question involved in the case being one of fact as to whether the homicide was the result of accident or of design, and there being evidence from which the jury could fairly infer that the shooting was not accidental but willful, and the presiding judge having approved the verdict, there is no legal cause for reversing the judgment denying a new trial. *Judgment affirmed.*

April 27, 1892.   By two Justices.

Criminal law. Murder. New trial. Before Judge BOYNTON. Spalding superior court. February term, 1892.

Conviction of murder, with recommendation of life imprisonment; exception to the denial of a new trial. The question is, whether the verdict is supported by the evidence. The persons present at the commission of the homicide were, the defendant Hattie Nelms, her twin sister Minnie (the deceased), their mother and one Woodruff. From the testimony of Woodruff the following appears: The shooting occurred in Woodruff's house where the defendant had a room he had rented to her. Minnie and their mother lived elsewhere. The girls were preparing to go out when the mother came in and a few words were said between defendant and Minnie by way of blame about cutting some clothes. Woodruff got defendant to go in her room. Defendant spoke this against her mother; she said, blame it she had "no sense no how"; and Minnie took it up. Defendant was speaking to her mother, and in that time Minnie jumped up to go, got the key and got off a little piece, and said, "Lets go home, Mother; Hattie aint got no sense no how." Woodruff said, "I will not have that; go into your room, Hattie," and Hattie went right into the room, stayed there about fifteen minutes, and came out. Woodruff did not see any pistol. She said, "You better not say what you did again or I will knock your head off," or something like that; she was talking about Minnie. Woodruff got up and said to defendant, "I told you to go in your room and stay there." He pushed the mother back and reached to defendant to push her back into her door, and the pistol went off, but Woodruff did not see it; it was done in a moment, and defendant asked him and her mother how came them to let her do that; she said she did not intend to do it. Woodruff said, "I did not know you had the pistol, and you had no business with it." He did not know whose pistol it was; defendant said it was hers. (It was introduced in evidence, and

was not a self-cocker.) Minnie was not doing anything
more than cursing defendant at the time; they were
standing about six feet apart; after the pistol fired de-
fendant laid it on the mantel-piece. Defendant said,
before she went out, something concerning her mother
was a fool for not cutting something right, and that is
how came Minnie to speak and tell her she was a "durn
fool." It was five or six minutes after defendant came
back into the room before the pistol fired. After she
had said, "You better not say what you said," or some-
thing like that, Minnie still stuck to what she said at
first ("durn fool") and said, "Come on, lets go home,
Mother"; and they stood there some moments, and
Woodruff got up, stepped across the fire-place and told
her to go in her room; he just had his arm raised and
pushed her, and the pistol went off. Woodruff had
seen the pistol in defendant's room once or twice before
that, and thought he had seen her loan it to her mother,
whose house had been broken open. Beyond what has
been stated there was no quarrel between these girls.
They did not impress Woodruff as being angry with
each other. He did not apprehend any difficulty, or
fight, or anything of that kind between them; they
were laughing and talking just before that as lively as
he ever saw two sisters, and they lived together in friend-
ship and peace; there was never at any time any hard
feelings between them that he knew of. They had made
arrangements to go out and have their dresses cut,
which arrangements were broken up by their mother
coming in; some one suggested the cutting of a gar-
ment; their mother started to do the cutting and did
not cut it exactly right; and then this quarrel got up.
When defendant went into her room her mother had
started to the door, and Minnie had got up after these
words were spoken. She said to her mother, "Come
on and lets go home," and was standing near the door;

her mother was standing between Woodruff and defendant to the right of him. He and the mother were standing between defendant and Minnie. Defendant was standing nearest to her door, her mother next, then Woodruff and Minnie. Defendant, when she came in, had her hands either down by her side or under her apron, as far as Woodruff knew. He never saw her raise her hands up before the pistol fired. She never pointed it at Minnie; never said anything about shooting Minnie. When it fired she caught right around Woodruff and said she was sorry and did not aim to do it; she then walked around the door and passed out, and seemed to be very sorry. A minute afterwards Woodruff saw her away up the street running. When her mother came in she said something to defendant about her loaning the pistol to her to carry home that evening. When it fired Woodruff was about putting his hand on defendant to make her go back again. The defendant was arrested in a drug-store, and told the person who made the arrest that she went in there to get some cordial. She further told him that she had killed her sister with a big yellow chair, that her sister was coming at her with a butcher-knife, and that she picked up a chair and knocked her down with it.

L. CLEVELAND and J. A. DREWRY, for plaintiff in error.

W. A. LITTLE, attorney-general, and J. H. TURNER, solicitor-general, by HARRISON & PEEPLES, contra.